# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# <u>ATLANTA DIVISION</u>

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Petitioner, | ) | Misc. No. |
| v. | ) | |
| | ) | |
| Timothy Ward, in his official capacity as | ) | |
| Commissioner of the Georgia Department | ) | |
| of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## <u>PETITION TO ENFORCE U.S. DEPARTMENT OF JUSTICE SUBPOENA</u>

The United States of America petitions this Court for an order enforcing the U.S. Department of Justice's (Department) administrative subpoena under the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. §§ 1997 *et seq.*, which the Department issued on December 14, 2021. *See* Dec. 14, 2021 CRIPA Subpoena No. 2021-01, Ex. 1.

The subpoena seeks access to documents relating to an ongoing investigation under CRIPA. Specifically, the United States is investigating whether the State of Georgia and the Georgia Department of Corrections (GDC) have violated the Eighth Amendment to the Constitution by failing to protect prisoners from substantial risk of harm. The Department issued the subpoena on December

14, 2021 and requested that GDC provide access to responsive documents by January 14, 2022 at 9:00 a.m. EDT. As discussed below, because the subpoena was properly issued and served, it seeks access to documents reasonably relevant to a pending CRIPA investigation, and GDC has not raised any cognizable defense to its enforcement, the subpoena should be enforced.

In support of this Petition, the United States alleges as follows:

## I.   JURISDICTION AND VENUE

1.   This is a proceeding brought pursuant to Section 3A(b)(2) of CRIPA, 42 U.S.C. § 1997a-1, to enforce a CRIPA subpoena.

2.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343, 1345, and 42 U.S.C. § 1997a-1(b)(2).

3.   Venue is proper because GDC's headquarters is located in Atlanta, Georgia, and multiple facilities within the scope of this investigation are located within this District. 42 U.S.C. § 1997a-l(b)(2).

## II.   STATUTORY BACKGROUND

4.   A prison's failure to take reasonable measures to protect prisoners from substantial risk of serious harm may violate the Eighth Amendment of the United States Constitution. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Helling v. McKinney*, 509 U.S. 25, 31–35 (1993).

5.    CRIPA authorizes the Attorney General to investigate conditions of

confinement in correctional facilities and initiate civil actions in the name of the

United States against state or local officials where that investigation gives the

Attorney General

> reasonable cause to believe that any State or political
> subdivision of a State, official, employee, or agent thereof, or
> other person acting on behalf of a State or political subdivision
> of a State is subjecting persons residing in or confined to an
> institution . . . to egregious or flagrant conditions of which
> deprive such persons of any rights, privileges, or immunities
> secured or protected by the Constitution or laws of the United
> States . . . pursuant to a pattern or practice of resistance to the
> full enjoyment of such rights, privileges, or immunities.

42 U.S.C. § 1997a(a).

6.    To enable the Department to carry out its law-enforcement

responsibilities, CRIPA authorizes the Department to "require by subpoena" that

investigated entities turn over documents and other materials and provide access to

facilities that are the subject of investigation, in order to determine whether prison

conditions deprive prisoners of their rights. 42 U.S.C. § 1997a-1(a).

7.    The subject of a CRIPA investigation is required to "yield to federal

law" and provide the Department access to facilities and documents needed to

conduct its investigation. *See United States v. Hale*, 261 F. Supp. 3d 1169, 1172–

73 (N.D. Ala. 2017) (ordering county sheriff to allow Department to interview

juvenile inmates and provide medical records in CRIPA investigation, and finding that CRIPA provided adequate protections for sensitive information contained in prisoner records).

### III.    THE DEPARTMENT'S INVESTIGATIVE SUBPOENA

8.    The Department issued and served the subpoena that is the subject of this petition on December 14, 2021. Declaration of Matthew Nickell ("Decl.") ¶¶52–53, 56–57; Ex. 1. The subpoena seeks access to documents including policies, training materials, documents related to staffing and personnel discipline, documents related to certain prisoners, incident reports and internal investigation materials, and internal audit materials. Appendix A to Dec. 14, 2021 CRIPA Subpoena No. 2021-01, Ex. 1-A, at 3–11.

### A.    Investigation History

9.    On September 14, 2021, the Department notified the State that it was expanding a CRIPA investigation it initiated in February 2016. *See* Decl. ¶¶2–3; Department Sep. 14, 2021 Notice of Investigation, Ex. 3. The investigation initially focused on whether the State was protecting lesbian, gay, bisexual, transgender, and intersex (LGBTI) prisoners from sexual harassment, sexual abuse, and sexual assault by GDC staff and other prisoners. *See* Decl. ¶2; Department Feb. 5, 2016 Notice of Investigation, Ex. 2 at 1. The expanded investigation also examines

4

whether the State fails to protect prisoners housed at close- and medium-security levels from harm due to prisoner-on-prisoner violence. *See* Decl. ¶3; Ex. 3 at 1.

10.    On September 24, 2021, the Department sent a request for documents to the State seeking documents related to prisoner-on-prisoner violence, as well as updated documents regarding the treatment of and potential harm to LGBTI prisoners, with a requested response date of October 25, 2021. *See* Decl. ¶6; Department Sep. 24, 2021 Request for Documents, Ex. 4.

a.    The Department sought documents of various types, including policies, handbooks, and training materials; documents related to staffing; the identities of specific staff who had been terminated or placed on leave, including because of sexual abuse investigations, as well as staff responsible for ensuring prisoner safety; GDC budget documentation from 2016 to the present; the identities of prisoners who identify as LGBTI so that the Department may know whose records to asses for possible sexual abuse; documentation about gang and security threat group membership; the identities of prisoners in protective custody, at risk of suicide, or at risk of sexual victimization; incident reports related to acts of violence and sexual abuse, including homicides; and internal audits conducted by GDC. Ex. 4 at 3–11.

b.      To date, GDC has provided access to only an incomplete set of policies (only a fraction of those requested have been provided), some blank form documents, a few organizational charts, and other documentation related to GDC facilities. Decl. ¶¶8–9. None of the produced documents included identifiable filenames or an index as the Department had requested, and GDC's counsel promised to provide. Decl. ¶7.

c.      GDC has provided access to no incident reports, documents or data related to homicides or acts of violence, documents about affected prisoners or staff, or various other categories of responsive documents. *Id.* ¶10.

11.    The Department met with and exchanged numerous letters with GDC's counsel regarding the September 24, 2021 document request before issuing the Subpoena on December 14, 2021. In those communications, the Department repeatedly asked GDC's counsel to provide reasons for withholding responsive documents. *Id.* ¶13.

12.    In those communications, GDC's counsel refused to provide access to the vast majority of responsive documents unless and until the Department satisfied several conditions that GDC's counsel had unilaterally imposed. *Id.*

a.      Chief among these was that the Department sign a nondisclosure agreement (NDA) very similar to one that GDC's counsel negotiated

6

on behalf of another client, the State of Alabama, in a different investigation. *Id.*
¶14.

       b.    GDC also objected to providing access to documents unless and
until the Department disclosed information about the basis of its investigation. *Id.*
¶40.

       c.    In addition, GDC indicated it had numerous other objections to
the document requests, but refused to disclose what they were despite repeated
requests from the Department. *Id.* ¶46.

### 1.    The NDA

13.    The Department is required to adhere to various federal laws that
ensure sensitive information is protected from disclosure. These laws include the
Freedom of Information Act and its exemptions, 5 U.S.C. § 552, Department
"Touhy" regulations, 28 C.F.R. § 16.21, and the Privacy Act, 5 U.S.C. § 552a. The
Department is required to maintain and destroy identifying health information in a
manner consistent with the policies and procedures established under 42 C.F.R. §
2.16, and comply with the limitations on disclosure and use in 42 C.F.R. § 2.53(d).
In addition, the Department is a health oversight agency under the Health
Insurance Portability and Accountability Act (HIPAA), which permits disclosure
of health records to the Department to conduct investigations like this one under 45

C.F.R. § 164.512(d), 45 C.F.R. § 164.501, and 45 C.F.R. § 164.512(f).

14.     At earlier stages of the investigation, the State never insisted that the Department enter into an NDA before providing access to responsive documents. *Id.* ¶15. Nonetheless, the State produced responsive documents of various types to the Department, including investigation reports, prisoner institutional files, grievances, and prisoner mental health files. *Id.* Many of these documents contained personally identifiable information, protected health information, and other types of sensitive information. *Id.*

15.     The State has never alleged that the Department mishandled or failed to protect the integrity of sensitive information produced in the course of this investigation. *Id.* ¶16.

16.     In a call on October 19, 2021, counsel for GDC stated that they expected the Department to sign an NDA before they would provide access to most of the documents the Department requested in its September 24, 2021 document request, notwithstanding that the State had previously produced sensitive information to the Department without an NDA in place. *Id.* ¶17.

17.     The Department repeatedly attempted to resolve GDC's concerns about sensitive information, including by sending a letter setting forth the Department's obligations to safeguard confidential information and providing

proposed revisions to GDC's proposed NDA. GDC took two months to respond to a markup the Department sent to GDC on December 9, 2021. *Id.* ¶¶19–28.

18.    The United States provided its most recent NDA revision to GDC on March 1, 2022, and GDC provided its most recent revision on March 14, 2022. The parties met most recently to discuss on March 17, 2022. Although the parties narrowed the outstanding areas of disagreement, several remain. For example, GDC has maintained that one portion of the NDA is non-negotiable: a fee-shifting term requiring DOJ's consultants to be liable for attorney's fees for breaching the NDA. To date, GDC has declined requests to reconsider this position, even though GDC acknowledged it knows of no legal support for this fee-shifting requirement. GDC also has insisted that all documents previously produced in the investigation without an NDA be treated as if they contained confidential information and thus become subject to the NDA's limitations on use and disclosure, or else that GDC be permitted to engage in a time-consuming process to review all previously produced documents to determine whether they should be deemed confidential. This retroactive application of the NDA is incredibly overbroad and could cause further substantial delays to the investigation. Furthermore, GDC has insisted on a provision requiring the Department to "protect[ ] the integrity of the Confidential Information, including but not limited to non-public sensitive security information

(e.g., non-public information contained in internal and non-public policies and operations procedures, facility security plans, and confidential documents included in investigation files)," along with various other examples. *Id.* ¶¶29–35; GDC Mar. 14, 2022 Revised NDA, Ex. 16. This vague and overbroad language introduces uncertainty and could interfere with the Department's obligation to disclose statutorily mandated information about the results of its investigation. *See* 42 U.S.C. § 1997b(a), (b).

19.     In addition, in meetings on March 7 and March 17, 2022, GDC suggested it would not agree to grant the United States access to its prison facilities for site visits in May and June 2022—including to view secure areas and conduct staff and even prisoner interviews—if the Department did not first execute an NDA and fulfill other as-yet unenumerated tour parameters. On March 18, 2022, the Department sent GDC a letter stating that it planned to conduct site visits of two GDC facilities, one in May and the other in June 2022. To date, GDC has not responded to the Department's letter regarding the planned site visits. Decl. ¶¶36–37.

20.     The Department repeatedly pointed out to GDC—including in calls on October 19, 2021 and November 9, 2021—that numerous documents it requested could not feasibly contain confidential information, and thus there was no good

faith basis to withhold them based on the lack of an NDA. *Id.* ¶38. For example, GDC has provided the Department access to no documents regarding homicides in any of its facilities. *Id.* ¶39.[1]

### 2. Demand for Information About the "Basis" of the Department's Investigation

21.    In several communications, GDC objected to the Department's document requests for purportedly failing to "disclose . . . information about the basis of the Investigation." GDC Nov. 17, 2021 Letter, Ex. 8, at 4; *see also* Decl. ¶40.

---

[1] Press outlets that have compiled counts of the number of homicides in GDC prisons report having done so based on State records. For example, the Atlanta Journal-Constitution reported that 53 homicides occurred in GDC facilities between January 2020 and November 2021 based on information from "the state's death certificate database," and based on how GDC and the Georgia Bureau of Investigation classified the deaths. *See* Danny Robbins, *Records Reveal 53 Georgia Prison Inmates Slain*, The Atlanta Journal-Constitution, Nov. 18, 2021, https://www.ajc.com/news/crime/records-reveal-53-georgia-prison-inmates-slain/KZ3JV4MT3FH4HLBLZQIA7AFYGA/. In addition, GDC used to issue press releases for every homicide or suspected homicide in the prisons, but then abruptly ceased doing so. *See, e.g.*, Press Release, Georgia Dep't of Corr., Inmate Death Under Investigation (Dec. 22, 2020), http://www.dcor.state.ga.us/NewsRoom/ PressReleases/inmate-death-under-investigation-40 (the last such press release, reporting death of Demetrius Stubbins at Georgia State Prison "as a result of injuries sustained during an altercation involving another inmate"); *see generally* http://www.dcor.state.ga.us/NewsRoom/PressReleases/PressReleases (listing no press releases regarding prisoner deaths in 2021 or 2022).

22.     CRIPA imposes no requirement on the Department to disclose the basis for opening an investigation. Instead, it requires the Department to disclose its conclusions at the end of an investigation if it identifies a pattern or practice of constitutional violations. *See* 42 U.S.C. § 1997b(a)(1) (requiring the Department to notify subject of investigation of alleged unlawful conditions, supporting facts, and minimum remedial measures at least 49 days before commencing a civil action for equitable relief under § 1997a(a)).

23.     The Department informed GDC in a call on October 19, 2021 that it could not disclose the basis of its investigation because this constituted privileged information related to the Department's decision-making process. Decl. ¶41.

24.     Nonetheless, in the spirit of cooperation, the Department informed GDC during the same October 19, 2021 call that its investigation is based in part on publicly available information to which GDC has equal access. *Id.* ¶42.

25.     Additionally, Assistant Attorney General Kristen Clarke delivered public remarks regarding the expansion of the investigation on September 14, 2021. In those remarks, Ms. Clarke stated that the investigation was based on publicly available information and information from stakeholders, and provided examples of some information that informed the decision to expand the

investigation, including the reported number of homicides in the Georgia prisons since 2020. *Id.* ¶45; AAG Clarke's Prepared Remarks, Ex. 17.

26.     Since the October 19, 2021 call, GDC has demanded that the Department specify what information it relied on in deciding to open the investigation. *Id.* ¶43. But this too calls for privileged information that cannot be disclosed.

27.     In further attempts to address GDC's concerns, the Department asked GDC to indicate specifically what information it needed to cooperate with the investigation. *See Id.* ¶44; Department Nov. 10, 2021 Letter, Ex. 7, at 2. The Department also offered to provide GDC additional information about the investigative process under CRIPA. *Id.* GDC never responded to either offer. Decl. ¶44.

### 3.     GDC's Other Objections

28.     In communications about the document requests prior to the issuance of the subpoena, GDC's counsel told the Department that it had various other grounds for withholding responsive documents, but refused to disclose what they

were unless and until the Department signed an NDA that was very similar to the

Alabama version. *Id.* ¶46.[2]

29.    Although it did not indicate whether it was withholding documents on

this basis, *id.* ¶47, GDC's counsel asserted in a call on November 9, 2021 that the

Department's document requests were burdensome, *id.* ¶48. The Department asked

counsel for GDC to explain which document requests were burdensome and why.

*Id.*; Ex. 7 at 2; Department Nov. 18, 2021 Letter, Ex. 9, at 1. But GDC provided no

response. Decl. ¶48.

30.    In addition, on numerous occasions—including during calls on

November 9, 2021 and November 19, 2021, as well as in the Department's

November 10, 2021 Letter, *see* Ex. 7 at 2—the Department offered to help

minimize potential burdens in providing access to documents by arranging a

meeting between technical staff for the Department and GDC. Decl. ¶49. GDC

rejected all such offers. *Id.* The Department also asked GDC to bring technical

personnel to a meeting on October 28, 2021 to discuss logistics and specifications

---

[2] GDC did not provide specific objections to any requests until its January 14, 2022 Subpoena Response, i.e., nearly four months after the Department sent its document requests on September 24, 2021. Decl. ¶61.

for providing access to documents. *Id.* ¶50. The Department's litigation support staff joined the October 28, 2021 meeting, but GDC's technical staff did not. *Id.*

31.    The Department has also informed the State's attorneys that, if the State had concerns with using its own staff to copy paper records, the Department could send a vendor to make copies. *Id.* ¶51. The Department continues to extend this option to GDC to assist with providing access to documents.

**B.    Issuance of the Subpoena**

32.    Because GDC provided access to only a tiny fraction of the responsive documents requested, and because GDC unequivocally refused to provide access to more documents until the Department satisfied the unilateral conditions described in Section III.A.1 *supra*, the Department issued and served a subpoena on GDC Commissioner Timothy Ward on December 14, 2021 pursuant to 42 U.S.C. § 1997a-l(a). *See* Decl. ¶¶52–53, 56–57; Ex. 1; Ex. 1-A.

33.    The Attorney General has delegated authority to issue, serve, and seek enforcement of CRIPA subpoenas to the Assistant Attorney General for the Civil Rights Division and any Deputy Assistant Attorney General for the Civil Rights Division. *See* Decl. ¶54; Mar. 17, 2016 Att'y General's Order No. 3648-2016, Ex. 18.

34.     The Subpoena was signed by Robert J. Moossy Jr., Deputy Assistant Attorney General for the Civil Rights Division. Decl. ¶55; Ex. 1 at 2.

35.     The Department served the Subpoena by electronic mail on counsel for GDC per an agreement of the parties to accept service by electronic mail or electronic transmission. *See* Decl. ¶¶56–57; Department Dec. 14, 2021 Email Serving Subpoena, Ex. 19; GDC Dec. 9, 2021 Email, Ex. 20 (stating that counsel had authority to accept service via email of a subpoena addressed to Commissioner Ward).

36.     The Subpoena gave GDC until January 14, 2022 to provide a response. *See* Ex. 1 at 1.

**C.     GDC's Response to the Subpoena**

37.     On January 14, 2022, GDC sent a response that included no additional responsive documents. *See* Decl. ¶59; GDC Jan. 14, 2022 Email with Subpoena Response, Ex. 21.

38.     GDC's response consisted of a six-page letter setting forth several purported bases for refusing to comply with the Subpoena, as well as a 34-page attachment with additional objections to the Subpoena and the individual document requests. *See* Decl. ¶60; GDC Jan. 14, 2022 Subpoena Response, Ex. 22, and

16

Attachment to the Subpoena Response, Ex. 22-A. This was the first time that GDC

provided specific objections to the Department's document requests. Decl. ¶61.

## IV.    ANALYSIS

### A.    The Subpoena Is in Support of an Investigation Conducted for a Legitimate Purpose.

The Department is investigating under CRIPA whether GDC's correctional

facilities have a pattern or practice of depriving prisoners of their rights, privileges,

or immunities secured or protected by the Constitution. *See* 42 U.S.C. § 1997a(a).

Specifically, it is investigating whether the State has (1) failed to protect LGBTI

prisoners from sexual harassment, sexual abuse, and sexual assault by GDC staff

and other prisoners, and (2) failed to protect prisoners housed at the close and

medium security levels from harm due to prisoner-on-prisoner violence. *See* Decl.

¶¶2–3; Ex. 2; Ex. 3.

A failure to prevent prisoners from harm due to sexual harassment, sexual

abuse, and sexual assault, or due to prisoner-on-prisoner violence, implicates rights

protected by the Constitution. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994)

("prison officials have a duty . . . to protect prisoners from violence at the hands of

other prisoners") (internal quotation marks and citations omitted); *Averhart v.*

*Warden*, 590 F. App'x 873, 875 (11th Cir. 2014) ("[a] prison official's failure to

prevent inmate-on-inmate violence may constitute deliberate indifference" in

violation of the Eighth Amendment); *Sconiers v. Lockhart*, 946 F.3d 1256, 1267

(11th Cir. 2020) (explaining that "severe sexual abuse of a prisoner" violates the

Eighth Amendment). Therefore, the Department's Subpoena seeks access to

documents in furtherance of an investigation conducted for a legitimate purpose

under CRIPA. *See* 42 U.S.C. § 1997a(a).

**B.    The Department Has Complied with All Applicable Administrative Steps for Issuing the Subpoena.**

Section 3A of CRIPA authorizes the Attorney General or, at the direction of

the Attorney General, any officer or employee of the Department of Justice, to

issue a subpoena for documents to determine whether institutional conditions have

deprived prisoners of their rights under the Constitution or federal law. 42 U.S.C. §

1997a-l(a). Section 3A requires that a subpoena issued under the statute bear the

signature of the Attorney General or any officer or employee of the Department

that the Attorney General has designated. 42 U.S.C. § 1997a-l(b)(1)(A). In

addition, the subpoena must be served by an individual or class of individuals the

Attorney General or a designated officer or employee designates for that purpose.

42 U.S.C. § 1997a-l(b)(1)(B).

Robert J. Moossy, Jr., Deputy Assistant Attorney General for the Civil

Rights Division, electronically signed the Subpoena. *See* Exs. 1 at 2. This was

within the authority granted him by the Attorney General. *See* Ex. 18 (delegating

18

authority to issue, serve, and seek enforcement of subpoenas pursuant to CRIPA to any Deputy Assistant Attorney General for the Civil Rights Division). On December 14, 2021, Department employees served the signed Subpoena by electronic mail on counsel for GDC per agreement of the parties. *See* Decl. ¶¶56–57; Ex. 19; Ex. 20. Accordingly, the Department complied with the required administrative steps for issuing the Subpoena. *See* 42 U.S.C. § 1997a-l(b)(1)(A) and (B).

**C.   The Subpoena Is Within the Department's Authority to Issue, Is Not Too Indefinite, and Seeks Access to Documents Reasonably Relevant to Its Investigation and Not in Its Possession.**

CRIPA Subpoena No. 2021-01 demanded that GDC provide access to documents responsive to the document request that the Department previously sent the State on September 24, 2021. *See* Ex. 1 (Subpoena); Ex. 1-A (document request included as attachment). The documents sought by the Subpoena are not already in the Department's possession because GDC refused to provide access to the vast majority of the documents requested. *See* Decl. ¶53; *supra* Sections IV.A and IV.B.

For reasons discussed in the accompanying Memorandum of Law, the CRIPA Subpoena's demand for access to documents is within the Department's authority, the demand is not too indefinite, and the documents sought are

reasonably relevant to the Department's investigation. *See United States v. Fla. Azalea Specialists*, 19 F.3d 620, 622–23 (11th Cir. 1994); Memorandum of Law, Section II.A.

**D.     All Other Prerequisites to the Subpoena's Enforcement Have Been Met.**

It is necessary to obtain responsive documents from GDC sought by CRIPA Subpoena No. 2021-01 in order determine whether there have been violations of the rights of GDC prisoners under the Constitution or other federal laws. For the reasons set forth in the accompanying Memorandum of Law, all GDC's objections to the Subpoena fail.

GDC cannot withhold documents based on the Department's purported failure to sign an NDA. And even if it could, GDC cannot unilaterally demand that the Department sign an NDA containing unreasonable terms such as a legally unsupported fee-shifting requirement affecting the Department's consultants. *See* Memorandum of Law, Sections II.A–B.

GDC has no grounds to withhold documents based on the assertion that the Department has failed to disclose adequately the basis, nature, or extent of its investigation. *See id.*, Section II.C.

GDC cannot use relevance objections to withhold documents that CRIPA expressly authorizes the Department to access, and even if it could, the documents sought are plainly relevant to this investigation. *See id.*, Section II.D.

GDC has not adequately justified assertions that the documents sought are overbroad or disproportionate, or that responding would be unduly burdensome, especially where GDC has refused to work cooperatively with the Department to identify responsive documents or determine efficient ways to provide access to them, for example by having technical staff for GDC meet with the Department to discuss efficient ways for providing access. *See id.*, Section II.E.

In addition, GDC cannot rely on unsupported privilege-based objections to withhold access to responsive documents, particularly where federal law generally and CRIPA specifically already provide protections to safeguard sensitive information. *See id.*, Section II.F.

GDC's numerous unsupported objections to the Subpoena are delaying the Department's investigation into potential constitutional violations in GDC's prisons. Decl. ¶62. The subpoena is properly enforced within the United States District Court for the Northern District of Georgia pursuant to Section 3A(b)(2) of CRIPA, which allows for enforcement of the subpoena in the United States District Court for the judicial district in which the institution is located. 42 U.S.C. § 1997a-

1(b)(2). GDC's Department headquarters is located in Atlanta, Georgia, and multiple facilities within the scope of this investigation are located within this District. Decl. ¶63.

## V.    CONCLUSION

WHEREFORE, the Petitioner United States respectfully requests that the Court:

1.    Issue an Order to Show Cause, directing Commissioner Ward to show why he should not comply with and obey the aforementioned CRIPA Subpoena No. 2021-01 and provide access to the specific documents requested by the Department. A proposed Order to Show Cause has been submitted with this Petition;

2.    Enter an Order directing Commissioner Ward to, within 30 days, obey the aforementioned CRIPA Subpoena No. 2021-01 by providing access to the documents requested in Exhibit 1-A, which was attached to the Subpoena; and

3.    Grant any such other relief as is just and proper, including the assignment of this matter to a Magistrate Judge to address specific issues of the parties and to facilitate compliance with the Petition and this Court's Order.

Respectfully submitted,

Dated: March 25, 2022

KURT R. ERSKINE
United States Attorney
Northern District of Georgia

/s/ Aileen Bell Hughes
AILEEN BELL HUGHES
GA Bar No. 375505
Assistant United States Attorney
U.S. Attorney's Office
600 United States Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
Telephone: (404) 581-6000
Fax: (404) 581-4667
Email: aileen.bell.hughes@usdoj.gov

/s/ Lance Simon
LANCE SIMON
GA Bar No. 447643
Special Assistant United States Attorney
U.S. Attorney's Office
P.O. Box 1702
Macon, GA 31202
Telephone: (478) 621-2663
Email: lance.simon@usdoj.gov

/s/ Bradford C. Patrick
BRADFORD C. PATRICK
SC Bar No. 102092
Special Assistant United States Attorney
U.S. Attorney's Office
P.O. Box 8970
Savannah, GA 31412
Telephone: (912) 652-4422
Email: bradford.patrick@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief, Special Litigation Section
Civil Rights Division

/s/ Laura L. Cowall
LAURA L. COWALL
DC Bar No. 481379
Deputy Chief, Special Litigation Section
150 M Street NE
Washington, D.C. 20530
Telephone: (202) 514-1089
Email: laura.cowall@usdoj.gov

/s/ Helen Vera
HELEN VERA
DC Bar No. 1025735
Trial Attorney, Special Litigation Section
150 M Street NE
Washington, D.C. 20530
Telephone: (202) 305-0132
Email: helen.vera@usdoj.gov

/s/ Christopher N. Cheng
CHRISTOPHER N. CHENG
PA Bar No. 69066
Trial Attorney, Special Litigation Section
150 M Street NE
Washington, D.C. 20530
Telephone: (202) 514-8892
Email: christopher.cheng@usdoj.gov

/s/ Matthew Nickell
MATTHEW NICKELL
CA Bar No. 304828
Trial Attorney, Special Litigation Section

150 M Street NE
Washington, D.C.  20530
Telephone: (202) 353-5644
Email: matthew.nickell2@usdoj.gov

*Attorneys for the United States of America*

## **L.R. 7.1(D) CERTIFICATION**

I certify that the foregoing has been prepared with one of the font and point options approved by the Court in Local Rule 5.1(C). Specifically, this document has been prepared using 14-pt Times New Roman Font.

This 25th day of March, 2022

*/s/ Aileen Bell Hughes*

AILEEN BELL HUGHES

ASSISTANT U.S. ATTORNEY